¡Simon, J,
The object of this action is to evict and dispossess the defendants from the property which they recovered, several, years ago, under the judgment of this court in the case of De Ar- *599 mas and CiicUllu v. The Mayor, Aldermen, &c. of New Orleans, reported in 5 La. 132.
The pretensions of the plaintiffs are based upon the following allegations : That, in the year 1788, one Thomas Beltran, alias Bertrand, obtained from Estevan Miro, then the Spanish Governor of Louisiana, a permission to inhabit and build a house on the lot of ground which is the subject of this controversy, which permission was confirmed and renewed, in the year 1794, by the Baron de Carondelet, the successor in office of Estevan Miro ; and that in virtue of the said permission, Beltran built a house on the said lot, which he and his family inhabited for a considerable number of years. That Thomas Beltran died on the 24th of April, 1803, leaving Catharine Maudes:, alias Gonzalez, his widow, and seven children by his marriage with her, viz.; Antoine, Raphael, Rosalie, Manuel, Margarita, Gertrude, Joseph and Thomas Beltran.
That the said widow, acting for all the parties interested, procured the lot to be surveyed in 1807, and filed said survey with the permission and other documents, in the Land Office at New Orleans, claiming the confirmation of said title to the lot; that in 1812, a report was made by the Land Commissioners, stating that they could not make any decision on this claim, but that they thought the government should confirm it.
They further state, that on the 29th of October, 1819, the widow and her two sons, Manuel and Joseph Beltran, conveyed by a notarial act passed before Philippe Pedesclaux, then a notary public, all their right, title and interest, in and to the said lot, to the late Barthelemy Lafon; the said vendors being then the only persons having any claim thereto, in consequence of the deaths of Rosalie, Margarita, Gertrude, Thomas and Antoine Bertrand, previous to the date of the said act; that the three first named deceased heirs of Thomas Bertrand died intestate; but, that Antoine Bertrand left a nuncupative testament by public act, which was duly ordered to be executed, and by which he instituted his mother his sole and universal legatee. And that as a part of the consideration agreed on in the act of sale, the said La-fon was to take at his own expense, such proper measures, and prosecute such suit, if necessary, as to obtain the possession and *600 peaceable enjoyment of the said property, the vendors being aware that their title was imperfect.
That the said vendee accordingly exerted himself to procure a patent for the said lot; but that after all the preparatory measures for that purpose, and the assurance that the patent should be granted, the said Barthelemy Lafon died in New Orleans, on the 29th of September, 1820, leaving an olographic will, which was duly ordered to be executed, and in which he instituted his brother Pierre Lafon as his universal residuary legatee, and Jean Gravier and John Poumairat, his testamentary executors.
They further represent, that the patent was signed by the President of the United States, on the 17th of February, 1821, fixing the extent and location of the lot, the title to which became vested in the heirs of the late B. Lafon ; and that said patent was soon after brought to this city by John Poumairat, who put it, together with the other title papers to the said lot, into the hands of Etienne Mazureau, Esq., an attorney and counsellor at law, and one of the defendants in this action, for the purpose of instituting a suit in the name of the estate of Lafon, against the Corporation of New Orleans, to recover possession of the property. That afterwards Pierre Lafon came to this city, and died in October, 1822, leaving a nuncupative will by public act, which was duly ordered to be executed, and by which he instituted the plaintiffs, who are his legitimate children, his only heirs. That the estate of Barthelemy Lafon was subsequently, grossly mismanaged, wasted, and fraudulently administered by the executors, against whom it became necessary to bring various law suits; in consequence of which, the affairs and claims of the estate were neglected, and the petitioners prevented from taking possession of the said lot, or bringing a suit for that purpose. That the validity of the sale to B. Lafon was never contested by Catharine Gonzalez, (who died on the 25th of March, 1826,) and her two children Manuel and Joseph Bertrand, until the latter were persuaded by the defendants, who were well acquainted with the said sale, to sell their claims to Christoval G. De Armas and Manuel S. Cucullu. That accordingly, on the 6th of May, 1830, the said Manuel and Joseph Bertrand, and other persons calling themselves the heirs of Rosalie Bertrand, pretended to sell the said lot *601 again to the saidDe Armas and Cuculla, by a notarial act which they executed, and in which it was stipulated, that the price of $12,000, should be paid by the purchasers, only after they should have obtained peaceable possession of the property. That since that sale, the said De Armas and Cucullu have taken possession of the lot, and have conveyed one-third thereof to Etienne Mazu-reau, Esq., in pursuance of an agreement entered into between them at the time of the original conveyance from Manuel and Joseph Beltran, in compliance with which, one-third of the lot was to belong to the said Mazureau in case of recovery, although he does not appear as a party to the said act.
They further allege, that the sale to De Armas and Cucullu, and the sale from them to Maznreau, were executed in bad faith on the part of all the parties therein concerned, they having a perfect knowledge of the sale to B. Lafon. That this knowledge was acquired particularly by the said De Armas and Mazureau, who Were attorneys and counsellors at law; that the latter was appointed by the Probate Court of New Orleans, the attorney to represent the absent heirs of the late B. Lafon, and acted as such j and that C. G. De Armas acted in various suits as the attorney at law of one of the petitioners, (Jeanne Victoire Lafon,) having been employed for that purpose by the late Christoval G. De Armas, who had been substituted to the late Antoine Sedeila, to whom Jeanne Yictoire Lafon had executed a full power of attorney on the 3d of March, 1823, for the recovery of her share in the said estate, which power of attorney and substitutions were not revoked before the death of her attorney in fact. That the claim of the estate to the said lot was frequently mentioned in the proceedings of the estate, and that in the suits which the petitioners and their father had instituted against the testamentary executors, the said Etienne Mazureau gave his testimony on two different occasions, on circumstances connected with the claim relative to the lot. They pray that the three defendants be ordered to answer certain interrogatories ; that the petitioners be declared to be the true and lawful owners of the said lot; that a writ of possession may issue accordingly ; and that said defendants be condemned to pay $200 per month, from the 6th of May, 1830, for rent and profits, &c.
*602 The defendants answered separately: O. G. De Armas firsts pleaded the general issue, and set up the sale of the 6th of May, 1830, by which he and his co-defendant Manuel S. Cucullu purchased jointly of Manuel Bertrand, since deceased, but represented by his widow and heirs, of Joseph Bertrand, yet living and residing in New Orleans, and of the heirs of Rosalie Bertrand, deceased wife of Joseph Taquíno, Sen., the lot in controversy, which sale, he says, was afterwards ratified by all the parties. He farther avers that, on the day of said sale, Manuel, Joseph and the three heirs of Rosalie Bertrand, were the only and lawful owners of said lot, and that they have never been divested of the same. That besides the sum of $12,000 which was promised to be paid by the purchasers to the vendors, as being the price of the property sold, the respondent and his co-purchaser also promised to sue for and recover the possession of said lot, and for that purpose to take all necessary measures and make the necessary expenses, all which was done at their costs, to the amount of 120,000 ; and that since the recovery of the lot, he and his co-purchaser have caused brick buildings to be raised thereon, to the amount of $25,000. He further says, that one of the plaintiffs is indebted to him in the sum of' $2000, for professional services rendered to her from 1822 to 1827. He prays that his vendors be called in warranty; and, should the plaintiffs succeed in establishing their claim to the property in dispute, that said vendors be condemned to reimburse him his share of the sum of $45,000, expended for the recovery of the lot and its improvements ; and that Jeanne T. Lafon be also condemned to pay him $2000 for services rendered, &c.
Manuel Simon Cucullu filed a similar answer, calling his vendors in warranty, and praying for the same judgment, (except what relates to his co-defendant’s claim for $2000,) with general relief.
And Etienne Mazureau joined issue by denying all the facts, and all the allegations of bad faith contained in the plaintiffs’ petition, putting said plaintiffs to the strict proof thereof, and denying specially that the petitioners have any right or legal pretension or claim to the property sued for.
The defendants’ vendors also answered separately: Joseph *603 Bertrand pleaded the general issue, and averred, that a legal title to the premises had never been made to B. Lafon by the respondent, his mother, nor by any other person by the act of sale referred to in plaintiffs’ petition; that he, respondent, was then a minor; that his said mother was legally married to one Domingo Gonzalez, then living; and that in the pretended sale, his said mother was not legally authorized, <fcc.
Joaquin Gomez, and his wife, as natural tutrix of the minor children of Manuel Bertrand, deceased, denied the plaintiffs’ allegations going to show that they derive any title to the property in contest from the late Manuel Bertrand. They further allege, that the sale to Lafon is invalid and void, as it never was recorded as the law requires; that it is also void, because Lafon has never complied with the stipulations therein contained ; and that Catha-rine Gonzalez, their grandmother, was not legally authorized to execute the act. They recognize the sale of Manuel Bertrand to the defendants for his undivided third part of the property in dispute, for the sum of $4000, which is yet unpaid ; and pray that the plaintiffs’ demand be dismissed ; and that the defendants De Armas and Cueullu, be condemned to pay the price by them due, &c.
In the mean time, a supplemental petition was filed by the plaintiffs, for the purpose of increasing their demand for rents and profits to $600 per month, instead of $200, as originally prayed for; and of pointing out the manner in which the improvements should be paid for, and the property divided, in case they were not entitled to recover the whole. This supplemental petition was answered by the three defendants, who pleaded the general issue.
Another supplemental petition was filed by the plaintiffs, for the purpose again of increasing their demand for rents and profits to $1200 per month, instead of $600 previously prayed for, making four hundred dollars per month to be paid by each defendant from a certain period ; and they accordingly propounded interrogatories to the defendants, in order to ascertain from them the amount of any lease which they may have made of the property, &c., and from the defendant Cueullu, whether he ever sold his *604 portion of the same, to whom, and by what act, and for what price, &c.
This petition was answered by the defendant Cucullu, who pleaded the general issue, and who, under oath, stated, that h e had leased his portion of the property after the buildings were finished, for the term of five years, by contract with one La-farge, <fcc.; that he sold his said portion to the house of Cucullu,' Lapeyre <fc Co., who sold it subsequently to Mdme Rosalie Des-londe, wife of Barth. Jourdan; and he gives the dates of the acts, (fee.
In an answer subsequently filed by several of the defendants’ warrantors, the latter, after pleading certain exceptions to the plaintiffs’ original and supplemental petitions, further say, that the pretended sale to B. Lafon is null and void, because Catha-rine Gonzalez, being then a married woman, was not legally authorized to sign the act; because Joseph Bertrand, one of the respondents, was a minor, and because his sister Rosalie Bertrand was then deceased, and represented by her children and heirs, all minors. They further aver, that the lot of ground sued for was the private property of the late Thomas Bertrand, and' made no part of the community which existed between him and his widow, Catharine Gonzalez; that if she inherited afterwards any portion of the lot, she was divested of her title to the same by her second marriage, whereby the naked property returned ipso facto to the children of the first marriage ; and that the sale to Lafon is also null, because he never complied with the conditions of the sale, failed to pay the price, which was less than one-half the value of the lot, and never had possession of it.
Manuel Bertrand, one of the children and heirs of Manuel Bertrand, deceased, also filed another answer, in which he says, that he is ready to defend his father’s vendees against the plaintiffs, and pleads in substance the same matters which were pleaded by his co-warrantors, &c.
This detailed exposition of the pleadings, necessary for a correct and- proper understanding of the real merits of the controversy, and of the true position in which the parties stand before us, presents mainly a mere question of title between two purchasers of the same property, from the same vendors, at different periods. *605 On the one hand, the title of the plaintiffs, originating from a sale passed to their ancestors by persons who pretended to be the .owners of the property in dispute, is attacked by the defendants and their warrantors, as being insufficient to transfer the ownership of the thing sold, and as amounting only to an inchoate title, which did not prevent the vendors from selling it again to another. On the other hand, the sale to the defendants is contested as being an invalid one, proceeding- from persons who were divested of their title to the knowledge of the vendees, and who therefore could not make an effectual, or valid transfer of rights which they did not possess, and which had been previously vested in other persons.
L. Janin, for the appellants.
We claim the lot because we have a notarial sale, whereby it became our property. Code of 1808, p. 346, art. 4. Civ. Code, 2431. French Code, 1583. We attack the sale to the defendants, because it was the sale of the property of another, and therefore null. Code of 1808, 348, art. 20. Civ. Code, 2427. French Code, 1599.
These articles are literally the same in the three Codes.
The defendants assert, that the property never was delivered to us, an assertion which we shall experience no difficulty in refuting.
Starting with this assumption, they contend, that a sale without delivery and without the payment of the price is not perfect, and does not transfer the property; that, if the vendor sells the property a second time, the second purchase, accompanied by delivery, will prevail over the first, not followed by delivery; that if the vendor refuses to deliver, the purchaser cannot compel him to do so, but can only recover damages against him ; that having no jus in re, but only ad rem, not being the owner, he cannot institute the action of revendication, but only the action exempto, which is an action of damages.
Such, it is admitted, was the Roman, Spanish and old French law.
But, we shall show, that even by those systems of law, the property was transferred without the payment of the price, if time was given ; and the second purchaser was not protected against the first, if he was informed of the former sale, before he bought himself and took possession. And lastly, we shall put it beyond doubt, that the French Code, and after it, our Code of 1808, wrought a radical change in the law of sale, since when, neither payment of the price, nor delivery, has been necessary to transfer the property.
*605 The Judge, a quo, thought that the defendants’ title must prevail. He rendered judgment accordingly, and after a vain attempt to obtain a new trial, the plaintiffs have appealed.
Nowhere is the old law explained with more clearness than, in Pothier’s Treatise on the Contract of Sale, from No. 319 to No. 324. He goes even further than the counsel for the defendants. So little was the property transferred without delivery, that until delivery took place, the creditors of the vendor might seize the property in payment of their judgments. Pothier, No. 321.
But Pothier, No. 320, also adds, that it is only from a second purchaser in good faith, inscius prioris venditiunis, that the properly cannot be recovered back. If he knew of the first sale, the first purchaser had against him a revocatory action. Thus Gomez, Yariae Resolutiones, Yol. 2, Cap. II, § 20, says :
Item qucero, si aliqua res vendatur duobus, vel pluribus diversis temporibus, quis eorum prooferatur 1 Dico quod ille proofertur cui prius res fuer it tradita.” And further on he limits this : “ Secundo principaliter limita et intellige, ut procedat quando secunda venditio alteri facta fuit celebrata bona fide, secus---- poterit primus emptor rem et traditionem revo-care actions in factum revocatoria.”
Thus also Lopez, in a note to the law quoted by the defendants (Part. 6, tit. 5, L. 1) says : “ Sed limitari potest, quod pro-pter scientiam emptoris de prima emptione, competat primo emptori actio revocatoria.”
In proof that the property is not transferred without the payment of the price, the defendants quote Part. 3, tit. 28, L. 46, in which occurs the following passage :
“ Empero, si el que ouiesse vendido su cosa a otri, le apode-rasse della; si el comprador non ouiesse pagado el precio, o dado fiador, o peños, o tomado plazo para pagar ; por tal apoder ami-■-ento como este non passaria el señorío de la cosa, fasta que el precio se pagasse ”
To which we beg leave to add the concluding part of the same law:
“ Blas si fiador, o peños ouiesse dado, o tomado plazo para pa-gar, o si el vendedor se fiasse en el comprador del precio ; es-tonce passaria el señorío de la cosa a el porel apoder amiento, maguer el precio non ouiesse pagado. Empero temido seria de lo pagarP
Thus, if the vendor granted time, or the purchaser gave security, the property passed to the purchaser, although he had not paid the price.
So says also Pothier, Yente, 150, No. 322:
“ 11 est particulier ¿ la tradition, qui se fait era execution du contrat de vente, qu’elle ne transfiere la propriéte a I’acheteur , que lorsque le vendeur a été payé ou satisfait du prix. Instit. tit. de rev. divis, § 41.
“ ha raison est que le vendeur, qui vend au comptant, est censé n’avoir volonté de transferer la propriété que sous cette condition. Mais lorsque le vendeur a bien voulu faire credit du prix a Vacheteur, la tradition, qui lui est faite de la chose, lui en transfiere la propriété avant qu7il en ait payé la prix. C’est pourquoi aprés que Justinien a dit: Yenditge 'et tradi-tas res non aliter emptori acquiruntur quam si is venditori pretium solvent, vel ei alio modo satisfecerit, etc., il ajoute : Sed si is qui vendiderit, fidem emptoris secutus fuerit, dicendum est statim rem emptoris fieri. Diet. § 41.”
The defendants, in transcribing the Spanish law, add the word cierto after the word “plazo.” Ifiiis is not to be found in our edition (Madrid, 1789, with Greg. Lopez’ notes,) though we have seen it in another. But though several times repeated, it is quite immaterial. Id cerium est, quod cerium reddi potest. Lafon, in payment of the lot, was — First to perfect the title, and that he did successfully. Second, to, institute suit if necessary. The court is now informed, that for this also measures were taken, and why they proved abortive. Third, to pay $2000, when he should be in possession. This part of the agreement we are not bound to fulfil, because the defendants themselves prevent our taking possession. A term may be designated not only by a day of the the calendar, but also by an event which is to happen. And when the event is to be the result of the exertions and measures of the purchaser, it will in law be considered as lapsed, whenever, in the exercise of due diligence, the purchaser might have brought it about. “Equity,” says Story, (1 Eq. § 61,) “looks upon that as done which ought to be done.” This is precisely the same term, 11 plazo f which was given to the defendants in their purchase from the Bertrands ; they were to pay only after recovery.
The position of the defendants leads to this absurdity, that until'the plaintiffs had paid the $2000, and although'they had brought suit against the corporation, and obtained a judgment of the Supreme Court, they had no title; that even after such a judgment they might have made a second and valid sale to another person. How could the plaintiffs have maintained a petitory action, if their sale had not immediately vested a title in them'? Was it not executed for this very purpose ?
The portion of the law of the Partidas, applicable to this state of facts is rather that which says the property is transferred, even without the payment of the price, if the vendor trusted the purchaser for the price, “ o si el vendedor se fiasse en el compra-dor del precio.”
But the plaintiffs had a sufficient delivery of the lot. Art. 29, p. 350 of the old Code, explains very particularly how the delivery of immoveables is made. This article, which is entirely conformable to the Roman and Spanish law, is in the following words:
“ 'íradition or delivery of immoveables is made by the seller, when he leaves to the purchaser the free possession of the same, by dispossessing himself, either by delivery of the titles, if any, or of the keys, if it is a place shut up, such as a house, a park, a garden, and the like ; or by putting the buyer on the premises j or only by letting him have a view of the same, or by consenting that he become a possessor; or by an acknowledgment on the part of the seller, that if he still retains possession, it is only in a precarious way, that is to say, as a person who possesses the property of another person, on condition of giving up said property at the request of the owner.”
It will be recollected that sin'ce 1812, the Bertrands had ceased to occupy the lot, (5 La. 186,) and that until 1822, the corporation did no act whatever evincing a design to prevent Lafon’s possession. He never enclosed or built on it, but this was not necessary for the purpose of delivery. In the words of the article, he had the view of the property: the vendors consented that he should take possession ; no one else was in possession ; they had delivered their titles to him. Plaintiffs still have, and gave in evidence, the original permission of settlement, signed by Governor Miro ; and another document, the survey of 1807, was delivered to Mazureau by Poumairat. This is the symbolic delivery, not existing, it is true, in our present law, nor in France since the Civil Code, hut well known to the Roman and Spanish and former French law, and expressly sanctioned by our first Code. It produces, both for the purposes of delivery and prescription, all the effects of a corporeal apprehension and occupation. Pothier, Vente, No. 322. 2 Gomez, Varice Resolutiones, No. 20, p. 18. The French Code, and after it, our Code of 1808, introduced an important change in the law.
Art. 4, p. 346, of the old Code, art. 2431 of the present Code, and art. 1583 of the French Code, say in the same words, that “ the sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and the price thereof, although that object has not yet been delivered, nor the payment made.”
The seller is bound to deliver the'property, (Old Code, p. 348, art. 24; Civ. Code, 2450, French Code, 1603,) unless the sale has been made for cash, (Ibid, p. 350, art. 36, Civ. Code, 2403, French Code, 1612,) in which case alone he can demand previous payment. And art. 38, p. 266 of the Old Code, 1903 of the Civ. Code, and 1138 of the French Code say :
“ The obligation to deliver the thing is perfect, through the mere consent of the contracting parties: it renders the creditor the owner, and makes the thing be at his risk, from the time when it was to be delivered, although the delivery may not have taken place, unless the debtor delayed to deliver it, in which case the thing remains at the risk of the latter.”
What can be in more direct opposition with these articles than the Roman, Spanish and old French laws, which say throughout, that the sale is not perfect and the purchaser is not the owner, without delivery and payment of the price? Any attempt to comment on so plain a proposition, could only obscure it.
But say the defendants, the sale is perfect by consent between the parties only ; [Old Code, 346, art. 4 ;] as to third persons, delivery is required. This is a gratuitous assumption — the Code says expressly what is necessary to give effect to the sale, as against third persons. It is not delivery but registry. Code of 1808, p. 344, art. 3. It is for the protection of third persons, that registry laws have been enacted in modern times, in most civilized countries ; they have superseded, and most effectually, the formerly existing necessity of delivery. Sales of moveables, which are not subject to registry, still require to be followed by delivery. Code of 1808, p. 266, art. 41. Civ. Code, 2453.
All the commentators on the French Code represent the former law as we have stated it, and explain and admit, that the Code in the articles we have quoted, and which have been copied into both our Codes, have entirely departed from it. 1 Troplong, Vente, p. 54, § 39, Duvergier, Vente, Nos. 24, 37, 39, 254. Ro-gron á l’art. 1583. 4 Toullier, p. 57, No. 59 ; p, 59, No. 61. 7 Id. p. 88, No. 37. See particularly Lahaye’s Code Civil Annoté, where under art. 1583, numerous authorities are collected.
We shall not trouble the court, with references to its own decisions. The points here raised have certainly the merit of novelty, but the reason is, that they are too well understood ever to have been questioned. The only cases quoted by the defendants are, Garritson v. His Creditors, 7 La. 51, and Monday v. Wilson, 4 La. 338 ; the one a case of a steamboat, a moveable, the other of slaves, for both of which the law yet requires an actual delivery. Code of 1808, p. 351, art. 28; p. 266, art. 41. Civ. Code, 2454, 1916.
It is urged that the sale is null in consequence of the non-performance of the conditions on which it was made. But the plaintiffs should have been put in mora, before claiming the rescission of the sale on account of the non-payment of the price. This question was discussed in the case of Ferrari, Administratrix, v. Rice et al. 11 La. 101. There also, the same individual had sold the land twice. The first purchaser sued the second in possession, who retorted that'the price had not been paid, and claimed the rescission of the first sale. The plaintiff’s counsel maintained, that “ a suit for the rescission of a sale must always be preceded by a suit for the price, and can be resorted to, only after the latter has proved ineffectual. Code of 1808, p. 360, arts. 87, 88. Civ. Code, art. 2541. Or, at least, that a judicial demand must be made for the price, and subsidiarily only for the rescission, if the price is not paid within the time fixed by the judgment. 10 Toullier, 260. 3 Delvincourt, 78 and notes. The purchaser must be put in default; Civil Code, arts. 2041, 2042, 1006; and this can be done by the vendor, only if ready and willing to perform his part of the contract, and when he offers to do so. But if he at the same time withholds the property, under color of a title adverse to that which he had transferred to the vendee, and threatens the vendee with rescission, h'is demand will not be listened to. 2 Troplong, Vente, 76. A rescission cannot be ordered when the vendee is disturbed or dispossessed, as in this case, by the act of the vendor, or his heirs.”
And the court- said : “ The rescission of the sale was properly overruled, on the ground of the absence of any evidence of the plaintiff having been put in mora, a circumstance which must essentially precede a demand for the rescission of a sale. It has been contended that the party was put in mora, by the plea claiming the rescission of the sale, and the absence of any tender, on her part, of the balance of the price due. To this it has been correctly objected, that those who have succeeded to the rights of Ferrari’s vendor, have manifested an unwillingness to receive this balance, and consent to a rescission, if they could succeed in repelling the plaintiff’s claim on the score of simulation, or any other.”
And the same authorities prove, that the law is the same, whether the rescission of the sale be demanded for the non-payment of the price, or for non-compliance with any other conditions to which the purchaser has subjected himself. They are indeed a part of the price.
'While it is admitted, that if the heirs of Rosalie Bertrand still retained their interest, the plain tiffs could not recover against them, the plaintiffs contend, that Mazureau and De Armas, who now own two-thirds of that interest, have become their trustees ira invitum, and must be deemed to have purchased for their account. See Story’s Equity Jurisp. §§ 21S, 219, 311,312, 313, 392, 533, 1195, 1254, 1261, 1262, 1265. MMichael v. Davidson, 7 Rob. 53.
Mazureau, for the defendants.
This case must be decided under the provisions of the Code of 1808, which was in force at the time of the sale to B. Lafon. This Code declares, p. 344, art. 1, that the contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself.” Enumerating the obligations created by the contract of sale,' it declares, p. 348 art, 24, that “ the seller is bound to two principal obligations, that of delivering and warranting the thing sold ;” adding, p. 350, art. 36, that “ the seller is not bound to make a delivery of the thing if the buyer does not pay the price, and the seller has not granted him any term for the payment.” The same Code declares, p. 360, art. 82, that “ the principal obligation of the buyer is to pay the price ;” and art. 86, that “ if the buyer does not pay the price the seller may sue for the dissolution of the sale.” This definition of the contract of sale is taken verbatim from Domat, Lois Civiles, Yente, book 1, tit. 2, sect. 1, art. 1. It is evident from this definition that until the purchaser has paid the price he cannot have the thing sold. From the moment that the parties have agreed ás to the thing and the price, the purchaser may have aright to have the thing, but it is not his until the price has been paid.
The ownership or property (propriety) of a thing is distinct from the thing itself. Code of 1808, p. 103,-art. 1. Civ. Code of 1825, arts. 480, 482, 483, 484. Art. 4, p. 346 of the Code of 1808, identical with art. 2431 of the present Code, declares, “that the sale is considered to be perfect between the parties, and the property (proprieté,) is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object, and for the price thereof, although said object has not yet been delivered, nor the payment made.” This article does not declare that the thing,, but that the property or oionership alone, is of right acquired as soon as there exists an agreement; and this property or ownership is only acquired, de droit, by the effect of the agreement; it is acquired, defait, only by delivery and payment of the price. “ The tradition or delivery is the transferring of the thing sold into the power and possession of the buyer.” Code of 1808, p. 350, art. 26. Code of 1825, art. 2452. It is evident then, that mere agreement as to the thing and the price, does not transfer the thing, though it suffices to transfer the property or ownership, The words power, (puissance,) and possession, used in the article just quoted, express very different things. One may have the possession of a thing, without having the power to dispose of it at his will. The delivery made in pursuance of a sale puts the thing both in the power and possession of the purchaser. This delivery is made because the price has been paid or surety given for its payment; then only is the property in the thing acquired, de droit and defait, and the title perfect. So long as the price has qot been paid, and the thing not delivered into the power and possession of the purchaser, the latter has but an imperfect ownership or property: for, 1. if the sale was not on a credit, the purchaser cannot cause the thing to be delivered to him but on paying the price; 2. if on a credit, and the price is not paid at the time fixed, the vendor may rescind the sale ; 3, the vendor retains a privilege to secure the price which follows the thing, into whosesoever hands it may pass. Code of 1808, p. 351, art. 36 ; p. 361, art. 86 ; p. 471, art.75. Codeof 1825, arts. 2463, 2539, 3216. “ La ventef says Domat, “ renferme la condition que Vacheteur ne sera le maitre qiCen pay ant le prix” Lois Civiles, book 3, tit. 1, § 5, No. 4. The principle established by the Code of 1808, is founded on the Roman law. “ Si pecu-niam dem, id rern accipiam, venditio est.n Law 5, § 1, ff. De preescrip. verbis. “ Quod vendidit, non aliter sit accipieniis, quam si aut pretium nobis solutum sit, aut satis eo nomine fac-tum." Law 19, ff. De contrahenda emptione.
u Le premier engagement de Pacheteur," says Domat, “ est de payer le prix-car Vacheteur n’est rendu le maitre de la chose vendue, que par ce payement, ou autre sureté qui en tienne lieu.’ Contr. de Yente, book 1, title 2, sect. 3, No. 1. Now there was neither price paid nor security given by Lafon, nor any proceedings commenced by him to obtain possession of the land; and when, in 1830, eleven years after his purchase, the land' was sold to De Armas and. Cucullu, it was not Lafon’s,. nor his heirs.
Art.4, p. 346 of the Code of 1808, is not tobe understood literally. If interpreted according to its letter, the purchaser would be entitled, immediately after the agreement as to the object and price, to an adtion to cause the thing to be delivered to him, which is not the case. The provisions of art. 242, p. 311, and art. 2 and 3, p. 344 of that Code, show that art. 4, p..346, cannot be understood literally. But even if this article were to be construed in the sense contended for by the plaintiffs, it could not be applied to third persons. The Code of 1808 declares a contract of sale to be a convention, and that such conventions, p. 270. art. 65, have no effect but between the contracting parties. The sale to Lafon can have no effect, consequently, against De Armas and Cucullu, who were third persons.
It is contended, that by art. 20, p. 348 of the Code of 1808, (Code of 1825, art. 2472,) “ the sale of a thing belonging to another person is null.” But “ Quod nidlum est non producit ef-fectum,” and Quod ab initio vitiosum est non potest tractu temporis convalescere.” Now both the old Code, p. 486, art. 67, and the new Code, art. 3442, declare, that one “ who becomes possessed of an immoveable estate fairly and honestly, and by virtue of just title, may prescribe for the same, after the expiration of ten years if the true proprietor resides in the territory, and after twenty years in case said proprietor resides abroadand (Code of 1808, p. 488, art. 85, Code of 1825, art. 3449,) that “ a just title is one by virtue of which property may be transferred, such as a sale, a donation, and the like,” &c; and the Code of 1825, to dissipate all doubt, declares, art. 3450, that “ by the term just title, in cases of' prescription, we do not understand that which the possessor may have derived from the real owner, for then no prescription would be necessary, but a title which the possessor may have received from any person whom he honestly believed tobe the real owner, provided the title were such as to transfer the property and art. 3451, that “ in this case by the phrase transfer the property, we understand not such a title as shall have really transferred the property, but a title which by its nature would have been sufficient to transfer the property, provided it had been derived from the real owner, such as a sale, exchange, legacy, or donation.” Here, then, is a case in which the sale of a thing belonging to another does not produce an effect; in which a sale, vicious in its origin, acquires by time the same force, against the true proprietor himself, as if the sale had been made by him personally. The sale of a thing belonging to another is only null, where the true proprietor revendicates it before the expiration of the term necessary to prescribe.
The sale of a thing belonging to another is absolutely null only in the following case. Peter cannot sell to Paul, nor Paul purchase from Peter, a thing which both know to belong to James. Such a sale is null, and produces no effect. Paul cannot demand the delivery of the thing, nor Peter the price. Paul has a title translative of property, but not being in good faith, he cannot avail himself of the prescription of ten or twenty years. He may prescribe by thirty years; but this is not the prescription of a purchaser; his title being of no importance in acquiring by this prescription, and his bad faith being no obstacle to it. This is the prescription of the usurper — of the robber. If the land be claimed, it suffices for him to say: possideo quia possi-deo — my possession is my title. Such a sale of a thing belonging to another is null by the Spanish law. 5 Partida, tit. 5, laws 19 and 54. By that law, as by our Codes, if the purchaser was ignorant of the fact that the thing belonged to another, he had recourse against his vendor in damages.
To sustain this action, the plaintiffs in this case must show, that the defendants knew that the thing purchased by them belonged to the plaintiffs, and not to those from whom they bought.
But even supposing the sale to Lafon, who never was in possession, to have been perfect, it could not affect the defendants, who were at the institution of this suit, and still are, in possession of the thing sold. “ Vaction ex empio,” says Pothier, Yente, No. 62, “ est une action simplement personelle, quinepeut avoir lieu que contre le vendeur et ses héritiers; elle ne pent avoir lieu contre un tiers détenteur a qui celui qui m’a vendu la chose Vaurait depuis vendue et livrée contre la foi die contrat qu’il aurait fait auparavant avee moi.” See also Domat, Lois Civiles, Yente, book 1, title 2, sect. 2, art. 13. Denizart, Collection des Decisions, verbo, Yente. vol. 4, p. 600, says : “ En matiere d’immeubles, it fa.ut que la vente soil suivie de tradition réelle de possession; parce que, lors qu’ une méme chose a été ven-due successivement a deux personnes différentes, on n’a pas recours á la date des contrats pour juger lequel des deux ache-teurs doit etre préféré ; l’antériorité n’est d’aucune consideration. La ,loi a imprimé des caracteres a la vente qui déter-minent sa réalité, telles sont la tradition de la part du vendeur et la possession de l’acheteur. Tout contrat de vente qui n’est pas suivie de la délivrance est moins une vente effective, réla-tivement au second acheteur, qu ’un simple engagement de la part des contractans d’exécuter réciproquement ce qu ’ils pro-mettent. Ainsi le second acquéreur qui a la tradition et la possession réelle en sa faveur est préféré au premier qui n’a ni tradition ni possession.”
These are the true principles of the contract of sale. Such is the law of Spain. 5 Partida, tit. 5, law 50. Such also is the law of France since the Code Napoleon. Bousquet, Explication du Code Civil, ed. 1806, vol. 4, p. 50, No. 4. Bernardi, Commentary on Pothier, note to No. 321 of the Treatise on the Contract of Sale, says: “ L’on vient de voir que Pothier rappelle la máxime du droit Komain que ce n’est pas par une simple convention, mais par la tradition réelle que le domaine, ou la propriété de la chose vendue est transférée. Cette doctrine n’avait lieu, dans notre droit Franpais qu’ a l’égard du tiers. La vente, quoique non suiuie de tradition, élait parfaite entre le vendeur el l’acheteur, mais non a l’égard du tiers. Le Code Civil a adopté cette máxi-me, art. 1583. - L’article 1583,” he continues, “ dit que la vente est parfaite, par le seul consentement, entre le vendeur et Vacheteur. II faut done quelque chose de plus a, l’égard, du tiers.” Art. 1583 of the Code Napoleon is adopted verbatim in the Code of 1808, which has, consequently, also adopted the doctrine of Pothier, that it is the tradition réelle, and not the simple consent oí the parties, which renders the sale perfect. Thus it is provided by the present Civil Code, art. 2456, that, “ in all cases where the thing sold remains in the possession of the seller, because he has reserved to himself the usufruct, or retains possession by a precarious title, there is reason to presume that the sale is simulated,” &c ; and art. 3399, that “ to be able to acquire possession of a property, two distinct things are requisite: 1. the intention of possessing as owner; 2. the corporeal possession of the thing.” Art. 2456 is founded on the Spanish law. Curia Feli-pica, book 2, ch. 13, verbo, Revocatoria, No. 14.
It is then the tradition réelle, the corporeal possession of the thing sold, which perfects the sale. This is so true, that the Code of 1808, p. 478, art. 23, declares, that “ the natural connection between the possession and the property makes the law presume that they are joined in the person of the possessor; and until it be proved that the possessor is not the right owner, the law will have hint, by the bare effect of his possession, to be considered as such.” Common sense would tell us, that it is only the real delivery of the thing which can notify third persons of the sale. The sale to Lafon being imperfect, gave the purchaser no jus in rem, but only an action ex empto against his vendor for damages, unless the latter preferred to deliver the thing on receiving the price.
At the time of the sale of Lafon, the law 46, tit. 28 of the third Partida, was in force in this State. That law is in these words : “ Apoderan vnos omes a otros en sus cosas, vendiendogelas o dandogelas en dote, o en otra manera, o cambiándolas, o por al-guna otra derecha razón. E porende dezimos, que por tal apo-deramiento como este, que faga vnome a otro de su cosa, o que lo faga otro alguno por su mandado, que passa el señorío de la cosa, a quel a quien apoderasse della. Empero,si el que ouiesse vendido su cosa a otri, le apoderasse della; si el comprador non ouiesse pagado el precio, o dado fiador, o peños, o tomado plazo cierto para pagar; por tal apoderamiento como este non passaiia el señorío de la cosa, fasta que el precio se pagasse. Mas si fiador, o peños ouiesse dado, o tomado plazo para pagar, o si el vende-dor se fiasse en el comprador del precio ; estonce passaria el se-ñorío de la cosa a el por el apoderamiento, maguer el precio non ouiesse pagado. Empero tenudo seria de lo pagar.
Thus, in general, the dominion, {el señorío,) passes by delivery, but in matters of sale, the simple delivery does not transfer the dominion, {el señorío.) The purchaser does not become master of the thing until the price is paid, unless he have given security therefor, or unless a fixed certain term or delay, {plazo cierto,) has been granted to him to make such payment. Thus, though Lafon had even obtained possession, (el apoderamienlo,) of the thing, he would not have become the owner or master of it; and could only have become so by paying the price, or giving security, or by proving that a fixed term or delay had been granted to him to make payment.
The doctrine of the Partida is in perfect accordance with the principles laid down by Domat. Vente, book 1, sec. 1, arts. 1, 2 ; sec. 2, arts. 1, 10 and note thereto. The law 46, tit. 28, of the 3d Partida is not inconsistent with the 6th law, tit. 5 of the 5th Partida, any more than the 2d art. of the 1st sect, of the 1st book of the contract of sale of Domat, is with the 10th article of the same section and book.
Art. 38, p. 266, of the Code of 1808, which declares, that “ the obligation to deliver the thing is perfect, through the mere consent of the contracting partiesand that, “ it renders the creditor the owner, and makes the thing be at his risk, from the time when it was to be delivered, although the delivery may not have taken place, unless the debtor delay to deliver it, in which case the thing remains at the risk of the latter,” applies only to moveables. But supposing this article applicable to sales of immove-ables, it could have no effect on the present case. This rule, which places the thing at the risk of the purchaser, is not founded on the idea that the sale is perfect by the consent of the parties. The reason of the rule is clearly explained by Domat, in a note to art. 2, sec. 7, tit. 2, of his Treatise on Sale. He says: “ Quoique Vachet.eur ne soil rendu proprement le maiire qu'aprés la dé-livrance, il ne laisse pas de souffrir ces pertes qui arrivent en-tre la vente et la délivrance, car, le contrat étant accompli, il a cel effet que Vacheteur pent contraindre le vendeur a la déliv-rance, et que le vendeur ne possede la chose vendue qu’avec la nécessité de la remettre a Vacheteur. It is then because the purchaser has neglected to obtain delivery after the contract has been perfected, that the loss is at his risk. Such was the Roman law ; and the same principle was incorporated into that of Spain, (5 Partida, tit. 5, laws 23, 27,) and was the law under which the sale to Lafon was made.
When the contract is perfect by the signature of the act, the vendor is under an obligation to deliver the thing, on the demand of the purchaser, accompanied by an offer of the price, and if, after such a demand, he delays to do so, the thing is at his risk ; if, on the other hand, the debtor is ready to deliver the thing sold, and the purchaser delays to receive it, the thing is at the risk of the latter. Nothing can be more just than this principle ; nor is it at all inconsistent with the doctrine, that payment and delivery alone render the purchaser the absolute master of the thing. The thing is not at the risk of the purchaser, after the agreement, but before the delivery and payment of the price, because he is its absolute owner ; but because he has neglected to do what he was bound to have done. It is, in this sense, that the maxim, res peril domino, is to be understood. “ Is qui actionem habet, ipsam rem habere videtur.”
It has been contended, that the registry of the sale supplies the want of delivery. The acts of 1810 and 1813, providing for the registry of sales, &c., were passed to protect third persons against the effect of art. 75, p. 470, of the Code of 1808, which grants a privilege to the vendor, on the estate or slave sold by him, for the payment of the price, whether a mortgage has been received or not. There is nothing in the registry laws which show, that the registry of the sale was designed to supply the place of the actual delivery of the thing sold. They provide, on the contrary, that though there has been an actual delivery, the sale must still be registered, to have effect against third persons. The same remarks apply to the registry act of 1S27, which was besides, long posterior to the sale to Lafon.
Art. 3, p. 344, of the Code of 1808, (Code of 1825, art. 2417,) prescribing the registry of acts of sale sous seing privé of im-moveables in the office of a notary, was designed only to give such acts a certain date. No one ever dreamt that such registry was intended to supply the want of an actual delivery of the thing sold.
Simow, J.
The origin of the title of Thomas Bertrand to the lot of ground in question, is fully described in the report of the case of De Armas and Cucullu v. The Mayor, Aldermen and Inhabitants of New Orleans, 5 La. 132. He died in 1803, leaving a widow and seven children. Some of those children died. His widow was married, in 1804, to Domingo Gonzalez.» She was separated in property from him in 1817, and after divers attempts to obtain a confirmation of their title to the lot from the government, of the United States, the widow and two of her children, named Manuel and Joseph Bertrand, sold said lot to Bar-thelemy Lafon, by a notarial act. This act was executed on the 29th of October, 1819, and purports to be made by Catharine Gonzalez, stating herself to be the wife by a second marriage, and separated in property,' of Domingo Gonzalez, and authorized, Oil account of his absence, to pass all acts, by a judgment of the Parish Court of New Orleans, stipulating as widow in community of Thomas Bertrand, her first husband ; and by Manuel and Joseph Bertrand, as heirs, each for one-half of their father’s estate. *618 They sell all the rights and pretensions whatever, which they have or may have to a lot of ground therein described, the purchaser declaring himself well acquainted with it, and the titles whereof are presently delivered to the purchaser, for his use and benefit, “ pour lui servir et valoir ce que de droit: Io. Moyennant la somme de deux mille piastres que l’acquéreur s’oblige de payer aux vendeurs aussitbt qu’il sera en paisible possession et jouissance du dit emplacement, et non pas avant. 2°. Et en outre a la charge par l’acquéreur qui s’y oblige d’'employer tons les moyens cbnvenables pour entrer en possession et jouissance du dit emplacement, d’intenter et supporter tous procés a cet égard, le tout a sesfrais.” The heirs of Rosalie Bertrand, in representation of their mother, as one of the heirs of Thomas, did not join their co-heirs in the act, and their portion never was sold to Lafon. The record further shows, that the Bertrands had ceased to occupy the lot from 1812 ; that about the year 1817, the Corporation bought certain lots of two individuals ; that in 1822 there was no trace of any house or improvement on said lot; and that, at that time, the Corporation widened the levée, and extended a portion of it, and of the public road, over a part of the lot in dispute.
Lafon, immediately after the sale, took certain steps to obtain a patent from the government. He carried on a correspondence with his friends at Washington, particularly with one Poumairat, who was charged by him to attend to the business, but died on the 29th of September, 1820, leaving an olographic will by which he,appointed Poumairat and Gravier his testamentary executors, and named his brother Pierre Lafon, as his universal legatee. After Lafon’s death, Poumairat continued to exert himself in obtaining the patent, which a few months afterwards, (17th of Feb-niary, J 821,) was signed by the President, and Poumairat came to New Orleans. It appears from the testimony of one of the defendants, (E. Mazureau,) taken in the Court of Probates, in 1822 and 1823, that the patent and other title papers were put into his, Mazureau’s hands, by Poumairat, with a request to institute a suit against the city corporation in order to put the estate in possession of the property; but it does not appear that any such suit *619 was instituted, owing to certain reasons disclosed by the evidence, which we shall have occasion to notice hereafter.
The sale to the defendants Cuculla and De Armas, under whom their co-defendant, Mazureau, holds, was passed by authentic act, on the 6th of May, 1830. It was executed by Manuel Bertrand and Joseph Bertrand, and by the heirs of Taquino, (Rosalie Bertrand’s heirs,) as the only and legitimate heirs of the late Catha-rine Gonzalez, widow of Thomas Bertrand, deceased. It describes thelot sold, and refers to the patent issued and signed by the President of the United States, in the name and in favor of the said Catharine Gonzalez; recites that said lot was inherited .by the vendors from their father and mother ; and states, that jt was made for and in consideration of the sum of $ 12,000 cash. On the same day, however, (the date of 6th of April 1830, on the document is evidently a mistake,) a counter-letter was executed under private signature by the parties, stipulating the same price, which the vendees promised to pay to the vendors, “ aussitot que nous sei'ons en possession et en jouissance paisible de la propriety du dit lot de ierre en son entier, et que nous n’aurons aucune raison de craindre d’y etre troubles, et que le dit acte de vente, (by notarial act, above referred to,) aura été ratifié par ladite Adelaide Taquino a sa majorité.'” It further stipulates : “ 11 est bien entendu que si nous ne pouvons obtenir une jouis-sance et une possession paisible de* la dite propriety, que nous ne pourrons jamais étre tenus de payer aux dits héritiers de Thomas Bertrand, ou a qui que ce soit, aucune somme d’argent, ou partie de somme, sous quelque pretexte que ce soit.” The sale was subsequently ratified. On the 14th of September, 1831, Mazureau, as counsel for his co-defendants, instituted a suit against the. city corporation ; said suit was decided in favor of the plaintiffs by a judgment of this court, rendered in February., 1833, and they were put in possession of the lot. They erected three brick buildings upon it, at an expense of 25,000, and on the 21st of December, 1833, they conveyed to Marzureau one-third of the lot and buildings, for the sum of $12,200. It further appears, that two of the branches of heirs of Thomas Bertrand" received their portions of the price, to wit: $4000 each; but that the $4000 coming to Manuel Bertrand’s heirs are still unpaid, *620 owing to the pendency of this suit, which was instituted on the 2d of March, 1835.
•Thus, it is shown, and this is even admitted by the plaintiffs’ counsel, that his clients can only pretend by virtue of their-sale, to claim two-thirds of the property, the other undivided third belonging at the time of the sale to Lafon, to the minor heirs of Rosalie Bertrand, deceased; that Joseph Bertrand, vendor of pne of the other two-thirds, being born on the 2d of February, 1799, was yet a minor at the time of the sale, and has never ratified it; that Lafon, or his representatives, who had obtained the patent, were never put in possession of the lot, and never brought any suit for that purpose ; that his said representatives never paid the price of the property, as said payment of price was only the result of their successful exertions; that the same lot was sold again subsequently by the heirs of Bertrand to two of the defendants, who transferred one-third thereof to their co-defendant after having been put in possession of the property; that agreeably to the conditions of the counter-letter, they brought a suit to obtain said possession against the city corporation, which suit was brought to a successful termination ; and that the original purchasers, Cucullu and De Armas, have paid two-thirds of the price, the other third remaining unpaid and in suspense on account of the present suit.
With regard to the other facts of the case, disclosed by the answers of the defendants to the interrogatories propounded to them by the plaintiffs, and by the evidence adduced on both sides, it will only be necessary to notice them hereafter, as they may then become important for the decision of the questions that may fall under our investigation.
Under the state of facts above noticed, and taking the respective sales of the parties as the main subject of their controversy, the first question which presents itself to our solution, is one of title, to wit: Which of the sales from the same vendors ought to prevail, and, consequently, who has the best title to the property in dispute ?
This question is one of great importance ; it is not free from, nay, it is even full of the greatest difficulties, and the conclusion which we have adopted is the result not only of. the most strict *621 and minute examination and attention which we have been able to bestow upon the subject, but also of our-long and mature deliberation. The case has been ably and elaborately argued on both sides, and the assistance' we have derived from the very able written arguments of the learned counsel, has contributed in no small degree to bring us to such conclusion.
The plaintiffs say, that they claim the lot, because they have a notarial sale whereby it became their property ; and that they attack the sale to the defendants, because it was the property of another and therefore null. The defendants assert, that the property never was delivered to the plaintiffs; and they contend, that such a sale without delivery and without the payment of the price, is not perfect, does not transfer the thing sold; and that, if the vendee sells the property a second time, the second sale, with delivery, must prevail over the first where no delivery has taken place. They further pretend, that the only remedy of the vendee without delivery, is the actionem empto, which is an action of damages against the vendor.
The respective positions of the parties mainly depend, upon a proper and correct interpretation of the laws which governed the State at the time of the first sale,. At that time, besides our Civil Code of 1808, the laws of Spain were yet in force in Louisiana so far as their provisions had not been repealed by, or were not contrary to those of our Code, and were also used and referred to in most cases as the basis of construction or interpretation of the new laws.
Art. 4, p. 366, of the old Code, relied on by the plaintiffs’ counsel as conclusive as to his clients’ rights, says : “ The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although said object has not yet been delivered, nor the payment made.” This article however is preceded by art. 1, p. 344, which gives the definition of the contract of sale to be: “ an agreement by which one gives a thing for a price in current money, and the other gives the price in order to hhve the thing itself and is followed by art. 24, p. 349, which says, that “ the seller is bound to two principal obligations, that, of delivery, and *622 warranting the thing which be sells by art. 36. p. 350, which provides, that “ the seller is not bound to make a delivery of the thing, if the buyer does not pay the price, and the seller has not granted him any term for the paymentby art. 82, p. 360, which says, that ‘‘the principal obligation of the buyer is to pay the price on the day and at the place mentioned in the saleand by art. 86, p. 360, which states, that “ if the buyer does not pay the price, the seller may sue for the dissolution of the sale.” Thus it would seem from these texts, that although the property, and we should say, the right of property, is acquired to the'purchaser with regard to the seller only, as soon as there exists an agreement between them as to the thing and the price, the thing itself is irrevocably acquired by the purchaser only after he has paid the price ; and that if such thing has not been delivered at the time of the sale, such delivery cannot be claimed by the purchaser, unless he has paid the price, or unless time has been granted to him to make the payment. There is clearly a vast difference between the right of property acquired by the purchaser with regard to the seller, and the right to the thing itself, which he cannot be said to have acquired, before he has paid the price; this latter right is called absolute ownership ; which, according to art. 1, p. 102, of the old Code, “gives a right to enjoy and to dispose of one’s property in the most unlimited manner.” . See also arts. 480, 482, 483, 484, of the' present Code. It is not .the thing which is acquired of right, but only a right to have the thing, to demand it from the vendor. The sale is perfect in this sense, that the purchaser, on his complying with the conditions of the contract, may demand the object sold, and that the vendor cannot refuse to deliver it; but the thing is not yet his ; his right to it is imperfect, is incomplete, until he has put himself in a condition to say, “it is mine,” and to enjoy and dispose of it in the most unlimited manner. This shows, that taking all the dispositions of the law together, as long as there is not a delivery of the thing, or a payment of the price, the sale, although perfect between the parties as to the right of property, that is to say, as to the right to ciemand the thing on the part of the seller, such right at least with regard to third persons, is yet inchoate; and does not become, complete, until possession of the thing itself *623 has been delivered and the purchaser has performed his principal obligation which is that of paying the price. Art. 26, p.. 350, defines delivery to be “ the transferring of the thing sold, (not the transferring of the right to the property,) “into the power and possession of the buyer.” This again makes the distinction between the right to the.thing itself, and the right to demand the thing; this right to demand may exist without the thing being in the power and possession of the purchaser, and under art. 36 following, it cannot be exercised, unless the price has been paid or time has been given. This is the purport of the law 46, Partida 3, tit. 28, which says : “ Empero, si el que ouiesse vendido su cosa a otri, le apoder asse della ; si el com-prador non ouiesse pagado el precio, o dado fiador, o peños, o to-mado plazo para pager; por tal apoderamiento como este non passaria el señorío de la cosa, fasta que el precio se pagasse. Mas si fiador, o peños ouiesse dado, o tomado plazo para pagar, o si el vendedor se fiasse en el comprador del precio ; estonce passaria el señorío de la cosa a el por el apoderamiento, maguer el precio non ouiesse pagado. Empero tenudo seria de lo pagar.” This law clearly demonstrates, that the property in the thing sold will not pass to the purchaser until he has paid the price, and that he will not be allowed to demand it unless hé has given security for the payment of the price, or has obtained a term for such payment, which term should be definitive, and not left to his discretion ; and thus the sale cannot be said to be complete, as long as the price has not been paid. See also L. 5, if. De prasscriptis verbis; and L. 19, ff. De eontrahenda emptione. Domat, book 1, tit. 2, sec. 3, No. 1. “ &acheteur rüest rendu le maitre de la chose vendue que par ce payement,ou autre sur eté qui en tienne lieu.n Pothier, Tente, Nos. 319, 320, 321. Gomez, Tarim Reso-lutiones, tom. 2, eh. 11, § 1?.
Here, it is true, Lafon or his representatives, having only acquired by virtue of their sale a right to the property, and to demand the thing sold from their vendors, might have claimed the delivery thereof from their said vendors, after the expiration of the delay, or on the happening of the event stipulated in the sale as the second condition, on paying the price stipulated in the contract, if the thing sold had remained, and was in the posses *624 sion of their said, vendors ; and it cannot be doubted, that in ordinary cases, the sellers would have been bound to make such delivery, on the payment of such price. But it is also true, that the event upon the happening of which Lafon was to pay the price, never took place ; that no time is specified in the act within which Lafon is to perform the condition; that by the contract, he was to take certain measures to obtain the possession and enjoyment of the property, not as against his vendors, in whose possession the thing was not at the time of the sale, but as against others, against whom suits were to be instituted for that purpose; that no suit was ever brought by him or his heirs, nor any proceeding had to obtain such possession ; that the payment of the price, and the right of the vendors to claim it, depended upon the result of his exertions ; that neither he, nor his representatives, ever had the possession of the lot; that several years had elapsed between the issuing of the patent and the second sale, without any step being taken by the plaintiffs to obtain the possession and enjoyment of the property ; and, suppose the defendants’ vendors had themselves instituted the suit necessary to attain the object of the sale, and had succeeded to recover the lot and taken possession of if, what would have been the consequence? Could the plaintiffs have called upon their vendors for the delivery of the thing, on offering the price ? or would they not be barred by their having failed to comply with the condition ? Certain it is, that at the time of the second sale, their right to the thing sold was yet inchoate ; that they had never become the absolute owners or masters of the said thing, and that although they had a necessary delay, for complying with the second condition of the contract, their silence during at least seven years, was perhaps a presumption that they had abandoned the speculation, and this may have induced their vendors to sell it to others. Be this as it may, the laws in force at the time of Lafon’s purchase, had provided for a case like the present, and we think they ought to govern it: The law 50, Partida 5, tit. 5, says : “ Una cosa vendiendo vn orne dos vezes a dos ornes en tiempos departidos &c. Otrosi dezimos, que si el postrimero comprador passasse a la tenencia, e a la possession, e pagasse el precio, que el la deve aver, e non el primero. E es otrosi el vendedor tenudo de tornar el precio si lo avia re- *625 cebido, con ios daños, e los menoscabos, que vinieron por esta ra-zón al primer comprador.” And Gregorio Lopez, in his commentary on this law, says : “ Quia in traditione consistit tot a virtus alieuationis,quia ex ea,et non ex venditions, transfertur domini-um.” It seems from the terms of this law, that the second sale must prevail, if it has been followed by the delivery of the thing, and the payment of the price ; and that the only remedy of the purchaser is, to claim the reimbursement of the price he may have paid, with damages. Gomez, Tarim Resolutiones, loco citato, puts the question : “ Item qucero, si aliqua res vendatur duobus, vel pluribus diversis temporibus, quis eorum prceferatur ? Dice quod iUe prcefertur, cui prius res fuerit traditaP It is ‘ true he says also : “ Secundo principaliter limita, et intellige, ut procedat, quando secunda venditio alteri facta, fuil celébra-la bona fide &c., secus &C., primus emptor poterit rem et tra-ditionem revocare actione in factum revocatoriaP And this is in concordance with the commentary of Gregorio Lopez on the law 1 of the 5th Partida, tit. 5; and with Pothier, Vente, Nos. 319 and 320 ; but this part of the case belongs to another branch of the question, which we shall hereafter examine. Pothier, however, in his Coutrat de Tente, No. 320, says : “ De-la il suit que si le propriétaire dune chose, apres I’avoir vendue á un premier acheteur, sans la lui livrer, avail la mauvaise foi de la vendre et livrer a un second, ce serait a ce second acheteur que la propriété serait transferee. Le premier n’aurait qu'une action personnelle centre le vendeur pour ses dommages,” Ac. Denizart, verbo, Tente, vol. 4, p. 609. It is clear, therefore, that the only relief the first purchaser would be entitled to, would be the action ex empto: “ Qui,” says Pothier, “ est une action sim-plement personnelle, qui ne pent avoir lieu que contre le ven-deur et ses héritiers,” &c. See Pothier, Tente, Nos. 61, 62.' Villadigo, Instrucción Politica, p. 325, Nos. 62, 63, 64, 65.
But it has been urged, under art. 20, p. 348 of the Code of 1808, that “ the sale of a thing belonging to another is null.” We have already said, that although the right to the property had been acquired by Lafon, still he had never acquired his right to the thing itself under the contract, inasmuch as he never was in a situation to be able to demand it, to wit, by complying with *626 the conditions of the sale. Then, the thing was not absolutely his at the time of the second sale ; and it cannot be said, that the lot was a thing belonging to another. But the sale of the thing of anotheris only null, when the vendor thereof has no title or right whatever to it. It is null in a certain sense, that is, so as not to operate a transfer of the property against the real owner; but it is not null in a certain other sense, as respects the parties, since it may give rise to damages. If it was absolutely null, it would produce no effect — “ quod nullum est, non producit ejfectum and, on referring to art. 3451, of our new Civil Code, we see that “ by the words transfer the property, (used in the preceding article,) the law maker xmderstands not st/.ch a title, as shall have really transferred the property, but a title, which by its nature, would have been sufficient to transfer the property, provided it had been derived from the real owner P Thus, a certain effect is given to such a sale ; it may be the basis of a just title, sufficient to prescribe under ; and if it was absolutely null, it would have no such effect. By the law 19, Part. 5, tit. 5, it is provided, that if a man sell a thing belonging to another, the sale will be valid. But here, again, the lot could not be considered as being the thing of another ; Lafon and his representatives had nothing but an inchoate title thereto ; it was not complete, and never was in a condition to be completed ; the vendors had not lost the right of dissolving the contract, and of disposing again of the property as their own, if the conditions were not complied with ; and it seems to us, that under the doctrine above recognized, and the laws quoted, the plaintiff's never acquired the right of considering the lot as theirs. If so, it could be sold a second time, as it was not the thing of another.
We think we have fully demonstrated, that the second sale made by the heirs of Bertrand to CucuIIu and De Armas, ought to prevail over that to Lafon, and that the defendants are entitled to keep the lot, unless from the evidence it has been shown, that the vendees were in bad faith, and that the object of the second sale was to defraud the plaintiffs. This will be the subject of the next branch of the case.
The sale made to two of the defendants was executed in May, 1830, and the patent to the lot was signed by the President, in *627 February, 1821, after Lafon’s death. Poumairat, who had acted as his agent in his efforts to obtain the patent, was one of his testamentary executors, and he came to New Orleans immediately afterwards, and left it in the hands of the defendant Mazureau,-with a request to institute a suit against the corporation, in order to put the estate in possession of the lot; he gave Mazureau at the same time the survey of the lot, and showed him a transcript of the notarial sale to Lafon, which, so far as Mazureau recollects, was not certified. A short time afterwards, Pierre Lafon came to Louisiana ; he was the universal legatee of his brother ; and misunderstandings broke out very soon between him and the execm tors. Contestations arose which lasted a long time, and in which, in 1822 and 1823, Mazureau gave his testimony, in which he státed his communications with Poumairat in relation to the lot and to the titles. On the arrival of Pierre Lafon, (in 1821,) Ma-zureau was by him engaged to continue the management of the business, and he consented to act as his counsel against the executors ; Poumairat was then absent, but soon returned, and felt disposed to settle the matter amicably; and it was at that time that Poumairat delivered to Mazureau the titles to the lot. Some time afterwards, Pierre Lafon grew impatient, reproached Mazm reau with neglect, and the latter getting tired of his clients, re^ turned their papers, after which they employed Canonge. Ma-zureau had nothing further to do with Lafon’s estate; he had never made any contract with P. Lafon, nor received a fee from him. In May, 1822, Grymes and Canonge became Lafon’s counsel. The executors filed an account, to which opposition was made by the heirs ; the lot in question was alluded to in their answer. In 1823, Mazureau’s testimony was again taken in relation to the lot, and he said, that the patent belonged to B. Lafon, as he had purchased the right thereto. It appears also, that the patent and survey remained in Mazureau’s possession, and that he found it at a later period when he removed to a new office ; he then requested Antoine Abat to inform the persons concerned, that he had those papers in his hands, and that they were at theii disposal; and by persons concerned, he meant the heirs of Lafon, with whom he had no relations since 1823, and Bertrand’s heirs., whom he did not know. It is also shown by the interrogatories, *628 that in 1828, a copy of the sale to Lafon was left at Mazureau’s office, he thinks, by Moreau Lislet, and that he and Moreau examined it very attentively, and concluded that it was good for nothing. The object of the examination was to ascertain whether there was any chance of success, in case they should bring a suit to obtain the possession of the property under that act, in which suit, Moreau Lislet proposed to Mazureau to join him. It is not shown, that Poumairat had any further communication with Ma-zureau, since 1823.
With regard to the defendant De Armas the record shows, that he was employed as counsel by the attorney in fact of one of the plaintiffs; that he acted as such during the litigation with the executors, from 1823 to 1827, during which the executors made the allegations concerning the lot. De Armas’ answers to the interrogatories prove, that he is not positive as to the time he acquired the knowledge of the salé to Lafon; he thinks it was about the 6th of May, 1830, but that it might have been previously ; but there is no proof that he was aware of the existence of the sale, whilst he was counsel, other than a mere presumption that he might have known it, in defending the interest of his client, in the litigations and discussions concerning the delivery of the estate to the heirs by the executors.
From this evidence we are unable to see, that any fraudulent intention existed on the part of De Armas, when he and Cucullu, against the latter of whom no such pretence can be raised, purchased the lots from the Bertrands. True it is-, he had been the counsel of one of the plaintiffs, but not for the purpose of recovering possession of the lot; his employment was in different matters altogether; and we cannot, even if we could presume it, assert it as a fact established, that he was sufficiently acquainted with Lafon’s title to the lot, to have ascertained that it was defective, or that it could be defeated by getting a second sale from the same vendors. The fraud, or intention to defraud, if any there was, is not brought home to him ; it cannot be presumed ; and it does not seem to us extraordinary that he should have, in 1830, three years after his services as attorney had ceased, made a purchase, from which he was to derive a certain profit, jointly *629 •with another person, against whom no allegation of fraud is made, or can be made.
As to Mazureau, the third defendant, we are not prepared to conclude from the evidence adduced, that his employment by his co-defendants in the suit against the City Corporation, and the sale made to him in 1833, were the consequence of any fraudulent intention on his part, to avail himself of the defect that may have existed in Lafon’s title, as derived from Bertrand’s heirs. It is true, he knew of the existence of the sale to Lafon, but he had ceased to be the counsel of the heirs since 1823; nay, he states that he had no further relations with them, since that time ; and although it would perhaps have been his duty to bring the suit, when he was employed by Poumairat, who had trusted him with the title papers, yet circumstances are shown from which his negligence, if it may be called so, cannot be attributed to any fraudulent purpose. A knowledge of the sale, without fraud, is insufficient. It is not pretended, that any compensation for his services was ever agreed on between him and Poumairat; on the contrary, it is proved that the parties interested were litigating between themselves; that he was employed against the executors ; that he returned the papers to his clients ; that he received no fee from them j and that he had nothing to do with the estate since 1823. They employed other counsel, through whom they were at liberty to institute their suit against the Corporation ; this they never did; they lost sight of their rights ; and if, seven years after Mazureau had ceased to be their counsel, the lot was sold to other persons, who employed him to prosecute the claim, we cannot say that there is any fraud, or even unfairness, in his accepting the defence of his new clients. Certain it is, that he was not the counsel of the heirs of Lafon, at the time of the sale in 1830; there is no proof that he had any hand in procuring that sale; that he made any disclosure of the knowledge he had of the titles; that he had originally any interest in the purchase ; nor that, in accepting to act in the suit against the city, he was prompted by any improper motive of taking advantage of the defective title of the heirs of Lafon, to make an undue speculation. They had lain dormant for more than seven years : other persons may have thought that they did not intend to exercise their rights; their *630 act of sale was an authentic and notarial one, subject to be looked at and read by any one; they were bound to proceed under their contract within a reasonable time; they could not deprive their vendors, by their negligence, of the value or price of the property ; and if third persons are to benefit from a similar speculation,for which they have given six times as much as the plaintiffs were to give, they cannot attribute it to any fraudulent act of their opponents. “ Leges vigilantibus, non dormientibus serviunt
We have been referred to the case of McMichael v. Davidson, 7 Robinson, as a case in point on this subject, but it does not seem to us to be applicable. There, Davidson had been acting as the counsel of the person whose rights he attempted to defeat j he stood in no other relation with the plaintiff than that of attorney and client; and we said, that the attorney, owing fidelity to the client, was bound to hold on to any advantage he had acquired for the latter, and could not gratuitously part therewith. This case is quite different; and, notwithstanding our disposition to hold attorneys at law, who derive their authority to act as counsel from licences obtained from this eourt, to the strictest principles of honor and probity towards their clients, in the practice of their noble profession, and to allow them no benefit from any undue advantage which they may get over the persons who entrust them with their business, we have been unable to discover in the evidence any fact going to show, that the two defendants against whom fraud or improper conduct has been alleged, deserve to lose the benefit of the transaction on which their defence is based, or merit our unqualified disapprobation.
On the whole, we conclude that, independently of other views under which the plaintiffs’ claim could be defeated, it is sufficient that their sale was inchoate, and that they never acquired the right of being put in possession of the lot, before it was sold to the defendants; and that nothing shows that the second sale, which, we think, must prevail, was not a fair and honest transaction.

Judgment affirmed.

 Janin for a re-hearing. The eonrt have declared that no title passed to Lafon for want of delivery and payment of the price. It is admitted, that such was the llomaa, Spanish, and the old French law ; but these laws were repealed by the *631 Code of 1808, which is identical with the new Code. Art. 4, p. 346 of the old Code, art. 2431 of the present Code, and art. 1583 of the French Code, say, in the same words, that “ the sale is considered to be perfect between the parties and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and the price thereof, although that object has not yet been delivered, nor the payment made.” Art 38, p 266 of the old Code, the same as art. 1903 of the present Code, and art. 1138 of the French Code, say: “The obligation to deliver the thing is perfect, through the mere consent of the contracting parties. It renders the creditor the owner, and makes the thing to be at his risk, from the time when it was to be delivered, although the delivery may not have taken place, unless the debtor delay to deliver it, in which case the thing remains at the risk of the latter.” All the French commentators agree, that these articles were enacted for the purpose of changing the old law which made the perfection of the sale dependent upon delivery and payment. Being contrary to .the old law they repealed it, and the effect they produced in France they produced in Louisiana.
Even by the Spanish law, the title and full ownership was transferred to the purchaser before the payment of the price, provided time was given for such payment. Partida 3, tit. 28, law 46.
“ This law,” the court proceed to say, “ clearly demonstrates that the property in the thing sold will not pass to the purchaser until he has paid the price, and that he will not be allowed to demand it, unless he has given security for the payment of the price, or has obtained a term for such payment, which term should he definite and not left to his discretion, and that the sale cannot be said to be complete as long as the price has not been paid.”
Now, the price or consideration stipulated by Lafon was, that he should, at his own expense, take all necessary measures to perfect the title and acquire possession, and that he should pay $2000 as soon as he should he in the peaceable possession and enjoyment of the property.
Did “ the seller not trust the purchaser for the payment of the price ?” To this the court have replied, that “ the term should he definite and not left to the discretion of the purchaser.” This distinction is not in the words nor in the spirit of the law. No authority supports it. But a term may be designated as well by the happening of an event as by naming a day. Id cerium est quod certum reddi potest. Pothier, Vente, No. 323, says: “ Lorsque le vendeur a bien voulu faire credit duprix á Vacheteur, la tradition qui lui est faite de la chose lui en trans-fere la propriéié avant qu’il en ait payé le prix.” So also says Justinian, Inst. De rer. divis. § 41, “ Si is qui vendiderit fidem emptoris secutus fuerit, dicendum est statim rem emptoris fieri.” In the case of Ferrari’s Administratrix v. Lambeth and others, 11 La. 107, a case also governed by the old Code, Gravier had sold the same property twice. The first purchaser sued the second in possession, and prevailed. Non-payment of the price was also the main defence, and it was held that, under the old Code (p. 360, arts. 87 and 88,) different in this respect from the Spanish law, a sale was never null, ipso facto, on account of the non-payment of the price, but that the purchaser must be put in mora by a suit for the price.
Plaintiffs have paid a part, the most important part, of the consideration, by obtaining the patent. Do the defendants not maintain an absurdity when they *632 contend, that plaintiffs have no title, becanse they had not paid the $2000, when the sale had been expressly made for the purpose of enabling them to institute a suit? How could such a petitory action have been instituted without a title in the plaintiffs ?
Plaintiffs have also proved such facts as constituted a delivery made under the old Code, if indeed a delivery had been necessary to the perfection of their title.
Art. 29, p. 320 of the old Code, which is entirely conformable to the Spanish and Roman law, says: “ Tradition or delivery of immoveables is made by the seller, when he leaves to the purchaser the full possession of the same, by dispossess, ing himself either by delivery of the titles, , , or by putting the buyer on the premises, or by letting him have a view of the same, or by consenting that he become the possessor, &c.”
Plaintiffs’ delivery had all these requisites, and one of them would have sufficed. We shall only add a word concerning the delivery of the titles. The sale states that the titles were delivered to the plaintiffs at the time of passing the sale. One of them, the permission of settlement, granted by Governor Miro, the root of the title, is still in their possession, and was produced in evidence. The other titles were delivered by Lafon’s executor to Mazureau. This delivery, which in the civil law is called the symbolic delivery, is sufficient for the purpose of acquiring both possession and prescription. Gregorio Lopez says in his second note to the 6th law of Part. 3, tit. 30, that there are cases in which possession is acquired without corporeal apprehension, as is seen in that law, and in the three following. And the second of these laws, (Part. 3, tit. 30, law 8,) is thus translated by Moreau and Charleton: ‘‘ A man acquires possession of a thing by the delivery of the title to him.” “ Where one man gives another an estate, or any other thing whatever, and delivers to him the title he already has, or makes and delivers to him a new one, the donee wilt acquire possession of the thing, though it had not been delivered to him corporally.” This law was commented on with great care and research by the Supreme Court, in the case of Gopelly and Deverges, H Martin, 170. That was also a case in which the property had been sold twice, and the court fully admitted, that if the original titles had been delivered, their delivery would have produced the same effect against the second purchaser as the corporal possession of the thing. The same doctrine is maintained by Pothier, Vente, No. 332, and Gomez, Var. Res., No. 20, p. 18.
If the Spanish law had not been changed by the Code of 1808, and if plaintiffs had had neither tradition nor delivery, still their title would prevail. For the civil law says expressly, that if the second purchaser knew of the existence of the first sale, the first puchaser can, before delivery and payment, recover the property from him.
Speaking of a double sale of the same property, all the old Civilians agree that, as a general rule, the second purchaser must prevail, if the property was delivered to him, and not to the first. But they all acknowledge the exception we now contend for. So Gregorio Lopez, in a note to law 1, Part. 5. tit. 5, says, that If the second purchaser was informed of the first sale, the first purchaser has against him the revocatory action. Pothier, Vente, No. 320, says, that it is only &om a second purchaser, ignorant of the first sale, inscius prioris venditionis, that *633 the property cannot be recovered back ; and that if he knew it, the first purchaser has against him the revocatory action.
And Gomez, Var. Res. vol. 2, chap. 1, § 17, (p. 17,) says, that the prior delivery will avail the second purchaser only if he was in good faith; and that, in the contrary case, the first purchaser can recover both the thing and its delivery, in a revocatory action.
And we have seen that the authorities agree in considering a second purchase, made with a knowledge of a prior sale, as made in bad faith.

Re-hearing refused»